136 N.J. Super. 1 (1975)
343 A.2d 832
GARDEN STATE FARMS, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION, DIVISION OF AERONAUTICS, PLAINTIFFS,
v.
MAYOR LOUIS BAY II, COMMISSIONER HAROLD FLOYD AND COMMISSIONER ARTHUR A. BROKAW OF THE BOROUGH OF HAWTHORNE, JULES BOUBLIS, JOSEPH ROONEY, JOHN SOTNECK, PAUL ELWOOD, JOSEPH PSOTA, AND THE BOROUGH OF HAWTHORNE, A MUNICIPALITY OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 8, 1975.
*4 Mr. Herman M. Jeffer for plaintiff Garden State Farms, Inc. (Messrs. Jeffer, Walter, Tierney, DeKorte, Hopkinson & Vogel, attorneys; Mr. Barry N. Shinberg on the brief and of counsel).
Mr. Douglas C. Borchard, Jr. for defendants Mayor Louis Bay II, Commissioner Harold Floyd, Commissioner Arthur A. Brokaw and the Borough of Hawthorne (Messrs. Evans, Hand, Allabough & Amoresano, attorneys).
Mr. Robert J. Passero for defendants Jules Boublis, Joseph Rooney, John Sotneck, Paul Elwood and Joseph Psota (Messrs. Raff & Passero, attorneys).
ROSENBERG, J.S.C.
This is an action in lieu of prerogative writs wherein plaintiff seeks to have an amendment to the zoning ordinance of the Borough of Hawthorne declared invalid and void. The factual record is comprised of a stipulation of facts agreed to by the parties and evidence elicited at a plenary hearing held pursuant to R. 4:69-1. From that record the court has made findings of fact in accordance with its inherent power and constitutional authority, N.J. Const. (1947), Art. VI, § V, par. 4, and, upon application of relevant provisions of law thereto, has concluded that plaintiff's attack upon the Hawthorne ordinance must fail.

I
The Borough of Hawthorne is located in the southeast portion of Passaic County, bounded on the north and east by *5 the Township of Wyckoff and the Boroughs of Ridgewood, Glen Rock and Fair Lawn, all located in Bergen County, and to the south and west by the City of Paterson and the Boroughs of Prospect Park and North Haledon, all in Passaic County. The population of the municipality is approximately 19,500 in an area of 3.63 square miles. It is a developed community with less than 339 acres of land still unimproved. Land use is devoted mainly to one and two-family homes, garden apartments, industry, office and commercial business and other public and private uses  churches, schools and parks, for example  which are characteristic of moderate-income suburban communities.
Plaintiff Garden State Farms, Inc. (Garden State) is the operator of an extensive dairy products business in Northern New Jersey, with over 85 retail stores selling milk and related food products. These outlets are supplied by nine processing and packaging plants owned by Garden State and located in New Jersey, New York and Pennsylvania. Among these plants is the company's main production facility located in Wyckoff on land contiguous to a parcel of land in Hawthorne owned by Garden State. This property, known as Lot 4 in Block 286, is a vacant lot situated at the intersection of Hopper Street and Braen Avenue within an I-1 Industrial Zone as described in Ordinance No. 1175 of the borough (1970 revision). The area north of Braen Avenue and west of Hopper Street is partially within an R-1 Residential Zone (one-family homes) and an R-2 Residential Zone (two-family homes), and the area south of Braen Avenue is partially within an I-1 Industrial Zone and an R-2 Residential Zone.
Garden State has sought to construct and maintain a helicopter landing pad on the above-described Hawthorne tract in order to facilitate fast and efficient transportation between its other production facilities and its Wyckoff plant. A statement of such intention, contained in a letter to Mayor Bay from Peter H. Sandfort, president of Garden State, was *6 submitted to the board of commissioners of the borough on October 6, 1971. At a regular meeting on that date the commissioners adopted a resolution granting the company permission to construct the helipad. Apparently this action was taken in the belief that local approval was a necessary prerequisite for issuance of a license by the Division of Aeronautics of the New Jersey Department of Transportation, such license being required by law for operation of a private helipad. N.J.S.A. 6:1-43. On February 21 and April 24, 1973 hearings were conducted on Garden State's application for a license at the Municipal Building in Hawthorne by Thomas W. Coyle, then Director of Aeronautics in the Department of Transportation. In his "Recommended Findings of Fact and Law and Conclusions" submitted to the Commissioner of Transportation on September 28, 1973 Coyle advised "that a license to operate a Class III VFR Daylight operation, private use only Helistop be issued to Garden State Farms." This recommendation was implemented by issuance of License No. H-289 to Garden State on October 29, 1973. However, on December 6, 1973 this license was suspended by Coyle because of irregularities in the administrative proceedings surrounding the grant of the license. At present the license remains suspended, with further action on it dependent at least in part upon the outcome of this lawsuit.
The action of the borough commissioners approving Garden State's intention to construct a helipad met with widespread objection from neighborhood residents who were opposed to the company's proposed use. The objecting property owners instituted suit in Superior Court seeking injunctive relief to bar construction of the helistop on the grounds that the proposed land use violated the borough zoning ordinance and thus required a variance from the ordinance. Such relief was denied and this court, in an opinion reported as Boublis v. Garden State Farms, Inc., 122 N.J. Super. 208 (Law Div. 1972), held that regulation of land use for a helipad *7 was within the zoning power of the municipality and that a variance was not required for such a purpose because it comprised an accessory use under the borough's zoning ordinance.
On or about March 7, 1973, following both the Boublis decision and commencement of the Division of Aeronautics hearings on Garden State's license application, the borough clerk received a petition in opposition to the use of the helistop which called for a popular referendum to amend the zoning ordinance to prohibit helipads within the municipality. Although this petition was rejected by the clerk, Ordinance No. 1223 was introduced at the April 18, 1973 meeting of the board of commissioners and finally adopted on May 2, 1973. That ordinance, which is the subject of the instant litigation, reads as follows:
AN ORDINANCE TO FURTHER AMEND THE ZONING ORDINANCE OF THE BOROUGH OF HAWTHORNE, REVISION OF 1970, HERETOFORE ADOPTED AS ORDINANCE 1175 OF THE BOROUGH OF HAWTHORNE.
The Board of Commissioners of the Borough of Hawthorne, in the County of Passaic and the State of New Jersey, do hereby ORDAIN as follows:
SECTION 1. That the Zoning Ordinance of the Borough of Hawthorne, Revision of 1970, heretofore adopted as Ordinance No. 1175 of the Borough of Hawthorne shall be and hereby is amended by the addition to Section 5 thereof of Paragraph 11, as follows:
11. In all districts the use of any land or property or any buildings or roof tops or structures, or the construction, development or alteration of any structure, roof or building, for the purpose of accommodating the taking off or the landing of airplanes, helicopters or any and all other types of airborne vehicles is specifically prohibited whether a principal use or accessory use.
SECTION 2. Any and all parts or provisions of Ordinance 1175, and any amendments or supplements thereto which are inconsistent or in conflict with this Ordinance are hereby repealed to the extent of said Conflict, and all remaining provisions of Ordinance 1175 as amended and supplemented are hereby confirmed and shall remain in full force and effect.
SECTION 3. This Ordinance shall take effect upon final passage and publication as provided by law.
The testimony of Mayor Bay, one of the witnesses called at the plenary hearing, sheds some light upon the genesis *8 of this ordinance. According to the mayor, the October 6, 1971 resolution of the commissioners granting Garden State permission to construct the helipad was adopted not only because such approval was considered necessary for action by the Division of Aeronautics but also in the belief that the borough was powerless to prevent the helistop from being built. This legal conclusion was not reached with the advice of counsel but rather on the basis of representations made to the mayor by Sandfort, Garden State's president, to the effect that regulation of helistops had been preempted by state and federal authority. Apparently as a result of the Boublis decision, the mayor and commissioners concluded that the borough in fact did have power over the proposed helipad use and thereafter chose to act accordingly. Mayor Bay quite candidly acknowledged that the expression of public sentiment evidenced by the petition played a part in the board's determination of how it should exercise its land use prerogative over Garden State's proposed use. The result was Ordinance No. 1223.
In deciding to enact an ordinance banning the takeoff and landing of aircraft within the borough Mayor Bay testified that he and the commissioners were concerned that such activity would have adverse impact upon the "serenity" of the community. The mayor expressed the belief that the general quality of life within the borough would be adversely affected by low-level air traffic. Such factors as increased noise and air pollution, potential increases in automobile traffic and the anticipated distractions and anxiety to residents caused by ascending and descending aircraft, all were mentioned by the witness as considerations in the decision to adopt the ordinance. While Mayor Bay conceded that none of these conclusions were supported by a survey of expert or lay opinion, he said that he based his conclusions on personal observations and his knowledge of Hawthorne and its citizens.
Also testifying at the plenary hearing was Francis R. Gerard, present Director of Aeronautics in the Department *9 of Transportation. Gerard outlined the functions of his Department under the Transportation Act of 1966, N.J.S.A. 27:1A-1 et seq., and indicated that one of the main problems faced by the Division of Aeronautics is locating air terminal facilities to implement the transportation requirements of the State. This is consistent with the witness' observation that under a working arrangement with the Federal Aviation Administration (F.A.A.) aviation problems on the ground are subject to state regulation while those in the air are within the province of federal control exercised by the F.A.A. Gerard identified the role of his Division in placement of facilities as being two-fold: to promote development of aviation to insure that facilities are safely established where needed, and to investigate applications and license terminal sites to guarantee that they are situated, maintained and operated in accordance with recognized standards of avigational and ground safety. Normal procedure of the Division is to work in coordination with local government officials so that these ends are served while at the same time accommodating the needs and desires of the localities. As a matter of policy Gerard stated that the initiative would not be taken to place a facility within a municipality where it was not wanted, although he offered the opinion that under its statutory authority his Department could dictate location of facilities to municipalities if it was felt that such action was necessary to serve the transportation needs of the population.
In response to questioning specifically directed to the Borough of Hawthorne, Gerard testified that there is no present or anticipated need to locate an airport for fixed-wing aircraft in the borough but that every municipality in which there is economic activity, including Hawthorne, should provide or permit helistops in order to promote business development. He noted that helicopters could land and take off safely from the borough despite its proximity to metropolitan New York airports, and he iterated that Garden State's helipad license is currently suspended because of the hearing *10 officer's failure to comply with administrative regulations and not because of safety considerations.

II
This action is in the nature of a declaratory judgment. N.J.S.A. 2A:16-53 provides that
A person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder. [Emphasis supplied]
It is apparent from the pleadings that an actual justiciable controversy exists, making a declaratory judgment action appropriate. N.J. Turnpike Auth. v. Parsons, 3 N.J. 235, 239-241 (1949); Unsatisfied Claim & Judg. Fund Bd. v. Concord Ins. Co., 110 N.J. Super. 191, 196 (Law Div. 1970); Union Cty. Bd. of Freeholders v. Union Cty. Park Comm'n, 77 N.J. Super. 425, 431 (Law Div. 1962), rev'd on other grounds 41 N.J. 333 (1964). The facts clearly indicate that Garden State has the requisite interest in the subject matter of the ordinance to seek a declaration of its validity. Bergen Cty. v. Port of N.Y. Auth., 32 N.J. 303, 307 (1960); N.J. Home Builders Ass'n v. Div. on Civil Rights, 81 N.J. Super. 243, 251-252 (Ch. Div. 1963); Union Cty. Bd. of Freeholders v. Union Cty. Park Comm'n, supra, 77 N.J. Super. at 431. There is no question but that these jurisdictional requirements for invocation of the Declaratory Judgment Act have been satisfied.
In addition to these jurisdictional prerequisites N.J.S.A. 2A:16-56 calls for mandatory joinder of all parties in interest in a declaratory judgment suit:
When declaratory relief is sought, all persons having or claiming any interest which would be affected by the declaration shall be made parties to the proceeding. *11 Defendants here include the mayor and commissioners of the Borough of Hawthorne; various residents of the borough given leave to intervene as parties defendant, and the borough itself. The mayor and commissioners are proper parties in their capacity as the officials in whom all governmental power of the municipality is vested. N.J.S.A. 40:72-2; Bd. of Trustees v. Union City, 112 N.J. Super. 484, 490 (Ch. Div. 1970), aff'd 116 N.J. Super. 186 (App. Div. 1971). Similarly, the borough is joined as a necessary and indispensable party to an action in which its zoning ordinance is attacked. Cobble Close Farm v. Middletown Tp. Bd. of Adj., 10 N.J. 442, 455 (1952); Mayor v. Montclair Bd. of Adj., 56 N.J. Super. 296, 301 (App. Div. 1959), rev'd on other grounds 32 N.J. 130 (1960). The intervenors are parties pursuant to the August 16, 1973 order of the assignment judge entered under authority of R. 4:33, which also joined the Division of Aeronautics as a nominal plaintiff. It thus appears that the parties interested in the subject matter of this action are properly joined in accordance with N.J.S.A. 2A:16-56 and that court action under the Declaratory Judgment Act is proper.

III
Garden State advances two arguments in its attack on the validity of Ordinance No. 1223. First, it contends that federal and state legislation have occupied the field in regulating aviation to the exclusion of local enactments. Second, it urges that, aside from the question of federal and state preemption, the ordinance violates the enabling statutes from which the municipality derives its local zoning authority. In both instances Garden State argues that the borough has gone beyond the scope of its powers in banning land use for aircraft take-offs and landings.
The Commerce Clause of the Constitution gives Congress pervasive power to regulate air traffic. U.S. Const., Art. I, § 8, cl. 3; City of Burbank v. Lockheed Air Terminal, Inc., *12 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); American Airlines, Inc. v. Town of Hempstead, 272 F. Supp. 226 (E.D.N.Y. 1967), aff'd 398 F.2d 369 (2 Cir.1968), cert. den. 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969); American Airlines, Inc. v. City of Audubon Pk., Ky., 297 F. Supp. 207 (W.D. Ky. 1968), aff'd 407 F.2d 1306 (6 Cir.1969), cert. den. 396 U.S. 845, 90 S.Ct. 78, 24 L.Ed.2d 95 (1969). The parameters of this authority are set out in the concurring opinion of Mr. Justice Jackson in Northwest Airlines, Inc. v. Minesota, 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283 (1944), reh. den. 323 U.S. 809, 65 S.Ct. 26, 89 L.Ed. 645 (1944):
Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government. [322 U.S. at 303, 64 S.Ct. at 956, 88 L.Ed. at 1290]
In the Federal Aviation Act of 1958, 49 U.S.C.A. § 1301 et seq., Congress has provided a comprehensive federal scheme to deal with air commerce under the administrative auspicies of the F.A.A. and the Civil Aeronautics Board (C.A.B.). The scope of congressional action has been held to preempt local ordinances restricting air traffic because of excessive noise, City of Burbank v. Lockheed Air Terminal Inc., supra, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547; American Airlines, Inc. v. Town of Hempstead, supra, 272 F. Supp. 226, and insufficient altitude of flight, American Airlines, Inc. v. City of Audubon Pk., Ky., supra, 297 F. Supp. 207; Allegheny Airlines v. Village of Cedarhurst, 132 F. Supp. 871 (E.D.N.Y. 1953), aff'd 238 F.2d 812 (2 *13 Cir.1956); it also has forestalled state court action to enforce a contempt order for use of an airport runway extension, United States v. City of New Haven, 367 F. Supp. 1338 (D. Conn. 1973), aff'd 496 F.2d 452 (2d Cir.1974). There is little doubt in light of these cases that states and municipalities are without authority to regulate "any operation or navigation of aircraft within the limits of any Federal airway or any operation or navigation of aircraft which directly affects * * * interstate, overseas, or foreign air commerce." 49 U.S.C.A. § 1301(4). See also Hanover Tp. v. Montclair, 108 N.J. Super. 461, 475-480 (Ch. Div. 1969), aff'd 121 N.J. Super. 536 (App. Div. 1972); Annotation, "Validity of municipal regulation of aircraft flight paths or altitudes," 36 A.L.R.3d 1314 (1971).
Although state and local authority is preempted in the area of "operation and navigation of aircraft," the extent of congressional preemption in related matters of aviation involving ground operations is not clear. Each case involving a preemption question "turns on the peculiarities and special features of the federal regulatory scheme in question." City of Burbank v. Lockheed Air Terminal, Inc., supra, 411 U.S. at 638; 93 S.Ct. at 1862; 36 L.Ed.2d at 556. A review of the scheme set out in the Federal Aviation Act of 1958 indicates that Congress did not endeavor to exclude state action in all areas relating to aeronautics. Sections 1324(b) and 1343(i) of Title 49, U.S.C.A., call for cooperation by the C.A.B. and the Administrator of the F.A.A. with state and local aeronautical agencies. This represents an express recognition of the role of nonfederal authority in the aviation field. Sections 1348, 1349, 1350 and 1353 give the Administrator various powers to develop plans, expend funds and formulate policy to provide air facilities. However, these powers do not preclude local action in areas of proper airport regulation. Aircraft Owners & Pilots Ass'n v. Port Auth. of N.Y., 305 F. Supp. 93, 104-105 (E.D.N.Y. 1969); City of Winner v. Lineback, 86 S.D. 165, 192 N.W.2d 705, *14 709 (Sup. Ct. 1971). Despite the comprehensive effect of federal regulation on air commerce, the states and localities retain power to regulate ground activities not directly involving actual aircraft operation.
Aside from the 1958 Act, the Airport and Airway Development Act of 1970, 49 U.S.C.A. § 1701 et seq., provides a basis for federal action in the area of air facility location and development. While the act requires federal approval as a condition for federal funding and thereby expands the concern of the Federal Government and the role of the Secretary of Transportation in the area of airport construction, it does not preempt state authority to develop, construct and enlarge airports. Town of New Windsor v. Ronan, 329 F. Supp. 1286, 1290-1291 (S.D.N.Y. 1971), aff'd 481 F.2d 450 (2d Cir.1973); City of Boston v. Volpe, 464 F.2d 254, 259 (1st Cir.1972). The continued prominence of state authority is expressly noted in § 1716(b), which bars submission of project applications from municipalities if such submission is prohibited by state law. It emerges that by enacting the Airport and Airway Development Act of 1970 Congress intended to complement rather than preempt state power over air facility development. The overall scheme reflected in the 1958 act and the 1970 act does not impede the continued viability of state authority over ground-based aeronautic facilities.
The role of the State of New Jersey and its municipalities in providing for the aviation needs of the population is well established. The State Constitution explictly authorizes acquisition of land for airports, a use which our Supreme Court has characterized as serving the "social needs of the times." N.J. Const. (1947), Art. IV, § VI, par. 3; Aviation Services v. Hanover Tp. Bd. of Adj., 20 N.J. 275, 281 (1956). In a series of enactments the Legislature has provided for concomitant state and local action directed toward the development and operation of air facilities. The statutory *15 program reveals the manner in which state and local authority is apportioned.
Title 6 of the Revised Statutes deals with aviation. N.J.S.A. 6:1-29 and 6:1-44 are relevant to the scope of state regulatory authority and read in pertinent part:

6:1-29. Powers and duties of the commissioner: adoption of rules, regulations and orders
Except as otherwise specifically provided by law, the Commissioner of Conservation and Economic Development shall promote progress and education in and shall have supervision over aeronautics within this State, including, but not by way of limitation, the avigation, flight and operation of aircraft, the establishment, location, maintenance, operation, size, design, repair, management and use of airports, landing fields, landing strips, heliports and helistops, sport parachuting centers, air markings and other avigational facilities, and the establishment, operation, management and equipment of fixed base operators. The commissioner may adopt and promulgate reasonable rules, regulations and orders regulating air traffic and establishing minimum standards for aircraft, pilots, fixed base operators, airports, landing fields, landing strips, heliports and helistops, sport parachuting centers, air markings and all avigational facilities within the State and establishing minimum altitudes of flight commensurate with the needs of public safety, the safety of persons operating or using aircraft and the safety of persons and property on the ground, and to develop and promote aeronautics within this State. The commissioner shall have power to promulgate and adopt any reasonable rules and regulations that may be necessary to effectuate the purposes of this act in the interest of public safety and the development of aeronautics in this State.

* * * * * * * *

6:1-44. Licenses: airports, airport managements, fixed base operators, avigation facilities, temporary landing areas for rotary wing aircraft, provisions for
The commissioner shall provide for the licensing of airports, airport and landing field managements, landing fields, landing strips, fixed base operators or other avigation facilities and temporary landing areas for rotary wing aircraft by rules, regulations and orders adequate to protect the public health and safety and the safety of those participating in aeronautical activities * * * [Emphasis supplied]
Under the Transportation Act of 1966, supra, the powers enumerated in the above-cited statutes are now vested in the Commissioner of Transportation (the Commissioner). N.J.S.A. 27:1A-3 and 4.
*16 In challenging Ordinance No. 1223 Garden State contends that the italicized language of N.J.S.A. 6:1-29 preempts any local control over aeronautics, including the location of landing facilities. It reasons that the action of the Borough of Hawthorne in prohibiting such facilities frustrates the Legislature's intention to place the control of aeronautics in the hands of the State and thus should be declared invalid.
The role of the court in construing any statute is to give effect to the legislative intention and purpose. State v. Carter, 64 N.J. 382, 390 (1974); N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338 (1972); Jersey City Chapter Prop. Owners v. City Council, 55 N.J. 86, 100 (1969); Caputo v. The Best Foods, 17 N.J. 259, 264 (1955); Bradley v. Rapp, 132 N.J. Super. 429, 433 (App. Div. 1975). In the case of N.J.S.A. 6:1-29, the purpose against which the section is to be tested is set out in N.J.S.A. 6:1-20:
The purpose of this act is to provide in the interest of public safety and of aeronautic progress for the regulation of aeronautics in and over this State; to require that aircraft, airports, airport managements, landing fields, landing strips, and other avigational facilities, airmen, ground personnel and all persons engaged in aeronautics within or over this State, shall conform to standards of safety and sound practice as prescribed by the laws of this State and any rules or regulations thereunder, and for uniformity in certain regards with the laws, rules and regulations of the United States Government.
Reading this statement in conjunction with N.J.S.A. 6: 1-29, it is clear that the Legislature intended that control in the areas of public safety and aeronautical development remain within the Department of Transportation. Authority in the safety area is implemented by the licensing power bestowed on the Commissioner in N.J.S.A. 6:1-44. However, the act does not clarify whether or the extent to which state control in supervision and development of aeronautics precludes local land-use power over location of facilities. This *17 uncertainty leads to the question of whether the act should be viewed as preempting local action in this area.
In determining if a statutory scheme precludes local action the court must ascertain whether the Legislature "intended to immobolize the municipalities from dealing with local aspects otherwise within their power to act." Summer v. Teaneck, 53 N.J. 548, 555 (1969). To that end a liberal construction is given to legislation favoring local action. N.J. Const. (1947), Art. IV, § VII, par. 11. In Kennedy v. Newark, 29 N.J. 178 (1959), where the court reversed a Law Division decision invalidating a Newark ordinance which required municipal employees to reside in the city as a condition for continuing employment, Chief Justice Weintraub identified the perspective which should be taken in analyzing legislative intent:
* * * The action thus taken is wholly consistent with the thesis that the area not covered by legislation shall be left to local determination upon the principal of home rule. Had the Legislature intended to restrain local action, the more likely course would have been to express that purpose. Before it can be said that the police power delegated to local government must remain inert, it must be clear that the Legislature intended to occupy the field or declared a policy at war with the decision made by local government. The delegated power may not be restrained upon the basis of speculation or dubious inference * * * [at 187]
See also, Chester Tp. v. Panicucci, 62 N.J. 94 (1973); State v. Ulesky, 54 N.J. 26 (1969); Summer v. Teaneck, supra, 53 N.J. 548; Masters-Jersey, Inc. v. Paramus, 32 N.J. 296 (1960).
Considering N.J.S.A. 6:1-29 in light of the above-cited rule of construction, it is the opinion of this court that local zoning power is not preempted by granting the Commissioner "supervision over aeronautics within this State." The expressed statutory purpose to promote progress and development in aeronautics does not necessarily mean that a municipality be precluded from determining whether or not airport facilities should be constructed within its *18 boundaries. To impute such a meaning to N.J.S.A. 6:1-29 would be to engage in the type of "speculation or dubious inference" expressly disapproved in Kennedy v. Newark, supra, and would run contrary to the constitutional mandate favoring broad local power. Accord, Boublis v. Garden State Farms, Inc., supra, 122 N.J. Super. 208; Ridgewood Air Club v. Ridgewood Bd. of Adj., 136 N.J.L. 222 (Sup. Ct. 1947); Yoemans v, Hillsborough Tp., 135 N.J.L. 599 (Sup. Ct. 1947).
An even more compelling reason for finding no preemption is the fact that elsewhere in the statutes the Legislature has vested municipalities with power over land use for airports. N.J.S.A. 40:8-1 and 40:8-2 explicitly grant localities the authority to initiate and pursue development of air facilities:

40:8-1. Acquisition and use of lands for airports; lease to others
The governing body of any county and the governing body of any municipality, or either of them, may acquire by gift, grant, purchase, condemnation or in any other lawful manner real estate or any right or interest therein for airport purposes and so use lands theretofore acquired for other public purposes and being used for airport purposes and erect thereon and maintain buildings for the airport purposes.

* * * * * * * *

40:8-2. Municipal airports; general powers
The governing body of any municipality may acquire, establish, construct, own, control, lease, equip, improve, maintain, operate and regulate airports or landing fields for the use of airplanes and other aircraft within or without the limits of such municipality and may use for such purpose or purposes and property, owned or controlled by such municipality suitable, therefor.
In attempting to discover legislative intention in any law it is proper to consider other laws which pertain to the same subject matter. Key Agency v. Continental Cas. Co., 31 N.J. 98, 103 (1959); Brewer v. Porch, 53 N.J. 167 (1969); Kingsley v. Wes Outdoor Advertising Co., 55 N.J. 336 (1970). It is evident that in N.J.S.A. 40:8-1 and 40:8-2 the Legislature intended to give municipalities an *19 active role in establishing airports. Presumably the Legislature was familiar with N.J.S.A. 40:8-1 (L. 1928, c. 181, § 1, as amended by L. 1929, c. 26, § 2) and 40:8-2 (L. 1929, c. 325, § 1, as amended by L. 1947, c. 85, § 1) when it enacted N.J.S.A. 6:1-20 (L. 1938, c. 48, § 1) and 6: 1-29 (L. 1938, c. 48, § 10, as amended by L. 1952, c. 201, § 2, and L. 1966, c. 100, § 1) since the former provisions predated the latter. N.J. State P.B.A. v. Morristown, 65 N.J. 160, 166 (1974); Brewer v. Porch, supra, 53 N.J. at 174; Matawan v. Monmouth Cty. Tax Bd., 51 N.J. 291, 299-300 (1968). Statutes in pari materia are to be construed together in ascertaining legislative intent. Mimkon v. Ford, 66 N.J. 426, 433-434 (1975); State v. Green, 62 N.J. 547, 554-555 (1973). When N.J.S.A. 6:1-20 and 6:1-29 are considered along with N.J.S.A. 40:8-1 and 40:8-2 it becomes apparent that the Legislature did not intend to preempt local land use control for airports. By the same token, the 1966 Transportation Act (L. 1966, c. 301, § 1 et seq., as amended) does not displace the permissive local authority granted in N.J.S.A. 40:8-1 and 2. Even without the rules of construction cited above, the first sentence of N.J.S.A. 6:1-29 would appear to compel consideration of N.J.S.A. 40:8-1 and 2 in adducing legislative intent. For these reasons the court concludes that the present statutory scheme in the field of aeronautics gives municipalities authority over land use for airports and therefore does not preempt local zoning activity in that area.
In the testimony of Gerard and argument of plaintiff's counsel various practical arguments were advanced for the proposition that the Department of Transportation should have full control over land use for airport facilities. Their basic contention was that the entire thrust of aeronautic development in the State could be thwarted if localities are able to individually zone for airport use. To illustrate the need for State control Gerard made reference to the "State Airport Development Plan, 1970-1990" prepared for the Division *20 of Aeronautics, which the court has had an opportunity to study. Evid. R. 9(2)(e). While it may well be that a unified system of laws preempting all land use power for aeronautics would best serve the interests of the people of New Jersey, such a policy decision should be made by the Legislature and not by the court. Until such a decision is expressed the court must enforce the legislative will as written. Dacunzo v. Edgye, 19 N.J. 443, 451 (1955); Schmoll v. Creecy, 104 N.J. Super. 126, 138 (App. Div. 1969), rev'd on other grounds 54 N.J. 194 (1969). In this case that means that the Borough of Hawthorne may zone to control land use for airport facilities.

IV
The fact that the borough has the power to zone for airport facilities does not in itself establish the validity of Ordinance No. 1223. As an exercise of its police power derived from the State the municipality's action must conform to the standards set out in the enabling statutes. N.J. Const. (1947), Art. IV, § VI, par. 2; Inganamort v. Ft. Lee, 62 N.J. 521 (1973); Kohl v. Fair Lawn Mayor and Council, 50 N.J. 268, 275 (1967); Morris v. Postma, 41 N.J. 354, 359 (1964). N.J.S.A. 40:48-2 gives municipalities broad authority to enact ordinances "for the preservation of the public health, safety and welfare of the municipality and its inhabitants." This regulatory power is expressly extended to regulation of land use by N.J.S.A. 40:55-30. The purposes of zoning legislation and its essential considerations are set out in N.J.S.A. 40:55-32:
Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, flood, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular *21 uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality.
Validity of the ordinance in question depends upon whether it is consistent with the requirements and reasonably serves the ends identified in these statutes.
The party attacking a zoning ordinance has the burden of affirmatively showing that it bears no reasonable relationship to any of the purposes for which the zoning power is granted. He must prove that the ordinance is arbitrary or unreasonable. Harvard Ent., Inc. v. Madison Tp. Bd. of Adj., 56 N.J. 362, 368 (1970); Barone v. Bridgewater Tp. 45 N.J. 224, 226 (1965); Morris v. Postma, supra, 41 N.J. at 359; Vickers v. Gloucester Tp. Comm., 37 N.J. 232, 242 (1962), cert. den. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963). The burden is a heavy one in view of the presumption in favor of an ordinance's validity and reasonableness. Collingswood v. Ringgold, 66 N.J. 350, 358 (1975); Harvard Ent., Inc. v. Madison Tp., supra, 56 N.J. at 368; Moyant v. Paramus, 30 N.J. 528, 534 (1959). This presumption and the nature of the judicial role limit the court's power in reviewing a zoning enactment, as indicated in Kozesnik v. Montgomery Tp., 24 N.J. 154 (1957):
The zoning statute delegates legislative power to local government. The judiciary of course cannot exercise that power directly, nor indirectly by measuring the policy determination by a judge's private view. The wisdom of legislative action is reviewable only at the polls. The judicial role is tightly circumscribed. We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable. [at 167]
It is necessary to apply these principles to all the facts and circumstances surrounding adoption of Ordinance No. 1223 to test its validity. Harvard Ent. Inc., v. Madison Tp. Bd. of Adj., supra, 56 N.J. at 369; Bogert v. Washington Tp., 25 N.J. 57, 62 (1957).
*22 The statutory basis for zoning regulations found in N.J.S.A. 40:55-32 requires that any ordinance promote public health, safety, morals or the general welfare. So. Burl. Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151, 175 (1975); Delawanna Iron & Metal Co. v. Albrecht, 9 N.J. 424, 429 (1952); Cresskill v. Dumont, 28 N.J. Super. 26, 40 (Law Div. 1953), aff'd 15 N.J. 238 (1954). In the case of land use for aeronautics the area of public safety is preempted by state control. N.J.S.A. 6:1-20, 6:1-29 supra. Since neither public morals nor public health are relevant to enactment of Ordinance No. 1223, the ordinance must serve the general welfare if it is to come within the scope of the enabling act.
The term "general welfare" is undefined in N.J.S.A. 40:55-32 but has been given an expansive meaning by our courts. So. Burl. Cty. N.A.A.C.P. v. Mt. Laurel Tp., supra, 67 N.J. at 175; Gruber v. Raritan Tp. Mayor and Tp. Comm., 39 N.J. 1, 9 (1962); Pierro v. Baxendale, 28 N.J. 17, 28 (1955). In Lionshead Lake v. Wayne Tp., 10 N.J. 165 (1952), app. dism. 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953), the court (at 172) expressed this breadth by noting that "so long as the zoning ordinance was reasonably designed, by whatever means, to further the advancement of a community as a social, economic and political unit, it is in the general welfare and therefore a proper exercise of the zoning power." The sense of the term is that the ordinance provide for the well-being of the community and its residents and their way of life.
Measured against this standard, Ordinance No. 1223 serves the general welfare of the Borough of Hawthorne. In the opinion of Mayor Bay and the commissioners the taking off and landing of aircraft within the borough would be disruptive to the community. In a highly developed municipality with a dense population living in residential areas interspersed among industrial and commercial zones, it is not unreasonable that the board of commissioners concluded *23 that air facilities would adversely affect the quality of life in the Borough. Although an airport is not a nuisance per se, Hyde v. Somerset Air Service, 1 N.J. Super. 346, 351 (Ch. Div. 1948); Schantz v. Rachlin, 101 N.J. Super. 334, 345 (Ch. Div. 1968), aff'd 104 N.J. Super. 154 (App. Div. 1969); Boublis v. Garden State Farms, Inc., supra, 122 N.J. Super. at 217, it "may become a nuisance if conducted in such an offensive manner as to interfere unreasonably with the general standard of comfort of neighboring property owners." Hyde v. Somerset Air Service, supra, 1 N.J. Super. at 351. Apparently the municipal officials concluded that such a result was inevitable in their community and zoned to avoid it. The record does not disclose a basis upon which to find this conclusion unreasonable or arbitrary. Thus, Garden State has not sustained its burden of proof and the ordinance should not be overturned.
It should be noted that this holding is reached on the specific facts of this case and is not intended to import general approval of restrictive zoning against airports. Indeed, in Aviation Services v. Hanover Tp. Bd. of Adj., supra, 20 N.J. 275, Justice Burling, in discussing N.J.S.A. 40:8-2, supra, makes it clear that zoning prohibitions against airport development should be closely scrutinized:
* * * We cannot ascribe a vain and impotent meaning to the statute. If the purposes sought to be achieved are to be thwarted by zoning plans which arbitrarily exclude airport uses from an entire municipal domain the progress envisioned by the Legislature and stimulated by this statute may go unrecognized. * * * [20 N.J. at 283; emphasis supplied]
Since the exclusionary action taken in Hawthorne was not arbitrary, the instant case does not fall within the language of Aviation Services. Each case in which a municipality bars air facilities must be judged on its particular facts to determine if the local action is arbitrary and should be invalidated.
Garden State makes a final argument that Ordinance No. 1223 was not enacted pursuant to a "comprehensive *24 plan" as required by the enabling statute. Such a plan is an integrated product of a rational process going beyond a piecemeal approach to land-use and may be reflected in the ordinance itself. It is mutable and may be amended so long as the final result continues to reveal a comprehensive plan. Kozesnik v. Montgomery Tp., supra, 24 N.J. at 166-167; Johnson v. Montville Tp., 109 N.J. Super, 511, 519-521 (App. Div. 1970). Ordinance No. 1175 of the borough reflects such a plan and the amendment to it by Ordinance No. 1223 in no way alters that character. The ordinance thus complies with N.J.S.A. 40:55-32, supra.

V
No proof has been offered to indicate any impropriety by the mayor and commissioners in adopting the ordinance. Pursuant to the rules of law discussed previously, the court is unwilling to speculate on the thoughts of the municipal officials to ascertain any hidden motivation beyond a concern for the welfare of the community testified to by Mayor Bay. The fact that the Borough of Hawthorne has authority to regulate land use for airport facilities under the current statutory scheme and has used its zoning power in accordance with the standards set down by the Legislature compels the courts to hold that Ordinance No. 1223 is a valid amendment to the Borough's zoning ordinance. The complaint, therefore, is dismissed.